Filed 12/31/14  P. v. Swaim CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064117 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF28060) |
| JOHNNIE WILLIAM SWAIM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Johnnie William Swaim guilty of committing lewd acts on a child under the age of 14 (counts 1 and 3) and oral copulation of a person under the age of 14 and more than 10 years younger than him (counts 2 and 4). The trial court sentenced him to 10 years in prison. Swaim appeals, contending the trial court erred in (1) allowing the prosecutor to admit evidence of prior acts of sexual misconduct, (2) failing to inquire into possible juror misconduct, (3) instructing jurors with CALCRIM No. 318; (4) sentencing him to the upper term based on improper aggravating factors, and (5) determining the restitution fine. Swaim also contends (6) his two convictions for forcible oral copulation (counts 2 and 4) must be reversed because they are lesser-included offenses of committing lewd acts on a minor, (7) the prosecutor committed misconduct by pointing out to the jury that he consulted an attorney upon learning of the victims' allegations, and (8) cumulative error requires reversal of his convictions.

We agree that counts 2 and 4 must be reversed and remand the matter for resentencing. The parties concede the issue regarding the restitution fine is moot. In all other respects, the judgment is affirmed. Accordingly, we reject Swaim's claim of cumulative error.

FACTUAL AND PROCEDURAL BACKGROUND

The victims in this case were Swaim's two daughters, J.S. and A.S. At the time of the offenses, Swaim was an officer with the California Highway Patrol. In August of 2011, when J.S. and A.S. were about 19 and 16 years old, they reported the following incidents to law enforcement.

One day, when J.S. was about five or six years old, Swaim asked her to come to his room. At the time, A.S. was asleep and Swaim's wife, Alicia, was at work. When J.S. entered the room, Swaim pulled his pants down and asked J.S. to put his penis in her mouth, telling her she would get in trouble if she did not do as he asked. J.S. held Swaim's penis in her mouth but could not remember if it was rigid. After the incident, J.S. went to the bathroom to rinse out her mouth.

When J.S. was around 10 years old, she told two friends about the incident. Alicia later learned about the allegations. Alicia and Swaim then confronted J.S. about what she had said. Eventually, J.S. told them she took back what she had said. When J.S. was older, she told at least three other individuals and A.S. about the incident.

In 2011, during a family trip to Hawaii, A.S. told J.S. that something had happened between her and Swaim when she was in the second grade. During that trip, J.S. told Alicia and Swaim that she was going to report what had happened to the police. After they flew home, Swaim took his family to consult with a lawyer. J.S. and A.S. each spoke with the lawyer individually. Later that day, J.S. reported what had happened to the Sheriff's Department and Child Protective Services.

After J.S. reported the incident to law enforcement, a social worker interviewed A.S. A.S. told the social worker that when she was seven or eight years old, she was at home alone with Swaim when he asked her to come to his room after checking the garage door to see if anyone was coming. After making A.S. kneel down, Swaim pulled down his pants, put his penis in her mouth and pushed her head with his hand. Afterward, A.S. went to the bathroom and brushed her teeth. Swaim made her promise not to tell anyone

3

what had happened.  About a week later, A.S. told Alicia what had happened, pointed to a penis in a human anatomy book and stated she had "seen that already" on her dad.  The following day, Alicia and Swaim called her into their room.  Alicia, who had been crying, asked A.S. if "it [was] real or if it was a dream."  Remembering her promise not to tell anyone, A.S. said it was a dream.

On the last day of their Hawaii trip, A.S. recalled that Swaim had asked her and J.S. to come into his room while Alicia was in the bathroom crying.  Swaim claimed he had not done anything and told his daughters there would be consequences if they went forward, such as him losing his job and having to sell the house.  The following month, A.S. recanted her allegations during an interview with a deputy district attorney.  At trial, A.S. testified that J.S. claimed Swaim had done something and asked A.S. to "go along with it."

Swaim testified in his own defense.  He denied ever placing his penis in the mouth of either of his daughters.  During cross-examination, Swaim claimed that other than a brief conversation in Hawaii about some unknown criminal allegations, he first learned about J.S.'s claims when he read the reports in this case.  Over a relevancy objection, Swaim testified that when the family returned to San Diego from Hawaii he took his daughters to a lawyer because he "had no idea what to do."

4

DISCUSSION

I. *Admission of Uncharged Acts*

A. Background

In her trial brief, the prosecutor advised the court of three prior sexual offenses committed by Swaim. Specifically, in 1981 or 1982, Swaim, who was about 15 or 16 years old at the time, molested his four year old niece, J. K., while she was at her grandparents' house in Brawley. While J.K. was lying on her stomach, Swaim pulled her pants down and licked her anus. In 1984 through 1986, when Swaim was between about 18 and 20 years old, he molested his seven to nine year old cousin, M. T. When M.T. was at the Swaim home in Brawley he gave her a ride on a three-wheeler and took her to a remote location where he touched her vagina. He continued to touch her inappropriately on the ride back. Finally, in 1992 through 1994, when Swaim was in his 20s, four to seven year old A. S. lived with the Swaim family. During that time period Swaim repeatedly molested A.S. The molestation included touching her vagina, digitally penetrating her, forcing her to touch his penis, forcing her to orally copulate him until he ejaculated and raping her. Swaim was charged with the offenses, but acquitted following a jury trial.

Defense counsel moved in limine to exclude all of the prior uncharged acts. At a pre-trial hearing, the court stated it had reviewed the paperwork submitted by both parties and discussed each incident with counsel. The court then asked questions about the allegations by J.S. The trial court ultimately excluded all evidence regarding A.S. under Evidence Code section 352. (Undesignated statutory references are to the Evidence

5

Code.)  It concluded, however, that the incidents involving M.T. and J.K. were admissible because they were highly probative on the issue of propensity, not unduly prejudicial based on remoteness, and introduction of the evidence would not take much time.  At trial, M.T. and J.K. testified about the incidents similar to the summary provided by the prosecutor in her trial brief.  Swaim denied sexually molesting J.K. and M.T.

B.  Analysis

Swaim, asserting his situation is similar to that presented in *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), contends the trial court erred by admitting the uncharged acts regarding J.K. and M.T. because the evidence was highly inflammatory, dissimilar and remote.  He claims admission of the evidence rendered his trial fundamentally unfair and also constituted an abuse of discretion under section 352.

Subject to the restrictions of section 352, section 1108 permits admitting evidence of the defendant's commission of another sex offense in a criminal action for a sex offense.  (*People v. Fitch* (1997) 55 Cal.App.4th 172, 175-176 (*Fitch*).)  With the enactment of section 1108, the Legislature determined that evidence of prior sexual offenses is particularly probative and necessary for evaluating witness credibility, to establish the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911-912 (*Falsetta*).)  As our high court explained, "the clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses.  'The propensity to

6

commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' " (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1164.)

We examine the admission of uncharged sex offense evidence under section 352. (§ 1108, subd. (a); *People v. Loy* (2011) 52 Cal.4th 46, 63.) Factors to consider in making the sections 1108 and 352 determinations are: the inflammatory nature of the uncharged acts evidence; the probability of confusing the jury; the remoteness in time of the uncharged act or acts; the consumption of time to introduce the evidence; and the probative value of the evidence. (*Harris*, *supra*, 60 Cal.App.4th at pp. 737-741.) We review a trial court's exercise of discretion under section 352 for abuse of discretion and will affirm the ruling unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Here, the uncharged incidents were generally similar to the charged crimes as all victims were prepubescent girls that Swaim knew. The similarity in the nature and accessibility of the victim revealed a propensity to sexually molest such victims. (*People v. Escudero* (2010) 183 Cal.App.4th 302, 311 ["significant similarities" existed as "defendant took advantage of his female victims when they were vulnerable"].) Significantly, as Swaim grew older, the age of his victims remained about the same. Swaim argues the uncharged acts (licking an anus and fondling genitals) were dissimilar from the charged offenses (oral copulation). This argument is misplaced as it erroneously focuses on the precise nature of his actions. (*People v. Britt* (2002) 104 Cal.App.4th 500,

7

504-506 ["the 'signature test' " is not the yardstick for admissibility under section 1108].) Subject to the limitation of section 352, all that is required for admissibility is that the uncharged acts constitute "sexual offense[s]" as defined by subdivision (d)(1) of section 1108.

That the uncharged incidents occurred up to 21 years earlier did not mandate their exclusion. " 'No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible' " and "[n]umerous cases have upheld admission pursuant to . . . section 1108 of prior sexual crimes that occurred decades before the current offenses." (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992.) Moreover, substantial similarities between the charged and uncharged conduct balance out the temporal remoteness. (*Ibid.*)

We acknowledge a risk existed that the jury might convict Swaim of the current charges to punish him for the prior uncharged offenses. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284.) To ameliorate this risk, the trial court instructed the jury with CALCRIM No. 1191. This instruction told the jury (1) it could consider the evidence of uncharged sex offenses only if the People proved by a preponderance of the evidence that Swaim committed them, (2) if the People did not meet that burden, it was to disregard the evidence entirely, (3) if the jury decided Swaim committed the uncharged sex offenses, it could consider that evidence to help it decide whether he committed the charged offenses, and (4) evidence of other uncharged sexual offenses was one factor to be weighed "with all the other evidence" and was not sufficient by itself to prove his guilt of the current charges. Additionally the court instructed the jury on the reasonable doubt standard

8

(CALCRIM No. 220) and to consider the instructions as a whole (CALCRIM No. 200). We presume the jury understood and followed the court's instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) Moreover, the prosecutor only briefly mentioned the uncharged incidents in her arguments to the jury and specifically reminded them of the language in CALCRIM No. 1191.

We reject Swaim's claim that his situation is similar to that presented in *Harris*. In *Harris*, the reviewing court concluded the trial court had abused its discretion in admitting evidence under section 1108 where the prior offense "described a viciously beaten and bloody victim who as far as the jury knew was a stranger to the defendant," but the charged sexual offenses involved "lick[ing] and fondl[ing] an incapacitated woman and a former sexual partner." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) Here, the uncharged incidents were not as different from the charged offenses as to render them of little probative value or so shocking as to inflame the jury. Rather, the uncharged incidents were not more inflammatory than the charged crimes.

Finally, Swaim submits section 1108 is facially invalid under the federal due process and equal protection clauses. He makes these arguments to preserve them for federal review, conceding our Supreme Court's decision in *Falsetta*, *supra*, 21 Cal.4th 903 rejected his federal constitutional arguments, and the decision in *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, compels us to follow *Falsetta*. Additionally, an earlier decision rejected an equal protection challenge to section 1108. (*Fitch*, *supra*, 55 Cal.App.4th at pp. 184-185.) Our high court cited *Fitch* with approval

in *Falsetta*, *supra*, 21 Cal.4th at page 918. Consequently, there is no reason for us to address Swaim's constitutional arguments.

In summary, we conclude that the trial court acted within its considerable discretion in allowing the uncharged acts testimony.

## II. *Alleged Juror Misconduct*

A. Background

At the end of a recess during J.S.'s direct testimony, defense counsel asked the court to preclude J.S. from being around the jurors, complaining that "everybody [wa]s doting around this witness, bringing her tissues" and that "all of the jurors [we]re just sitting there tentatively watching what [wa]s going on." The court addressed the issue at the next break, with defense counsel expressing concern about J.S. being in the hallway during breaks. The court indicated that it already instructed the jury to not consider anything that occurs outside the courtroom and instructed the prosecutor to keep the witness "[d]own the hall."

After the trial court precluded A.S. from testifying about charges against Swaim in 1995 that resulted in acquittal, A.S.'s father posted information on the Internet and protested in front of the courthouse. Defense counsel argued that A.S.'s father had a truck with a sign stating his daughter was molested by Swaim and suggested the truck might surface during the trial. Defense counsel asked the court to take steps to ensure that the jury was not improperly influenced or intimidated. At the end of the day, the court instructed the jury to not do Internet research, not get information from the Internet or news media and to "ignore that information." It also told the jurors that if someone

10

tried to influence or talk to them about the case they were to cease the conversation and send a note to the bailiff. Finally, it informed the jurors they were to "get all [their] information from right here in court and from no other source."

The following morning, there was a truck outside the courthouse. Defense counsel represented that a sign on the truck stated: "Convict Johnnie Swaim, D.A. let 1995 victim [A.S.] off" or whatever. I didn't read it all." After expressing his concerns, defense counsel asked the court to issue an order prohibiting signs regarding the case on "the courthouse steps." The trial court denied the request and denied defense counsel's request that the court ask jurors about the signs. At the first break, the court admonished the jury as follows:

> "Do not discuss the case amongst yourselves or with anyone else. Do not form or express any opinion. I do want to add this additional admonition that there has been publicity. A lot of people are interested in this case. You may see people that have signs or posters, whatever, regarding the case. Don't pay any attention to them. Maybe you won't see them, but, in any event, all of the evidence that you are going to hear in this case must come directly here from the courtroom on the witness stand, exhibits that are being presented. [¶] If you happen to see anything, don't talk to people about anything related to the case. It's extremely important. And if you happen to see something that is related to the case, particularly if it's some type of publicity, poster, anything on the Internet. There [are] all kinds of digital communication devices available to people. I'm going to ask you not to observe any of that."

At the end of the day, the court again advised jurors to not "pay attention to the media or outside sources of information." The next day, before the noon recess, the court again addressed the issue of media coverage with the jury, stating:

11

"[T]here has been media coverage regarding the case. I want to remind you not to look at any media, newspaper, or news programs. There [are] other people that have information nowadays. Media is not just the newspaper or TV programs, it's anybody on the Internet. Don't Google anything, look at anybody's Facebook regarding this case. Don't look at blog sites related to the case.

"I've been advised by my bailiff that there is somebody who has a truck with signs and things of that nature out front. Don't look at or read anything as far as those signs. If you happen to see them, just ignore them. As you have been advised, evidence has to come from the evidence presented here in court.

"Just to avoid that, you have the option, the bailiff has indicated to me, that you can leave by another door. The person apparently is trying to, you know, make public displays. As you probably understand, there is a [F]irst [A]mendment right, people can say anything they want outside of the courthouse and that's their [F]irst [A]mendment freedom of speech right. That's why we have newspapers. There is nothing wrong with that as far as somebody exercising their constitutional right. As jurors, it's important that you make sure that you follow the rules and the admonitions that I give regarding that.

"You can leave by another door. We have a security door at the basement that you can go out and come in if you want. If you want to do that, you can do it. I'm going to have the bailiff show you were that is at. Be sure that you tell them that you are in this trial and they will know to let you in."

After a juror asked a question about what door to use, the bailiff gave the jurors brief instructions on how to find the entrance. A few days later, before the beginning of a long weekend, the court went over scheduling then stated:

"There has been publicity. We talked about people trying to put up signs, things of that nature. Do not read, watch TV if there is anything related to this case on it, or have any conversations with anybody that deals with this case. Don't let anybody come and talk to you about that. If somebody tries to talk to you about this case, as I stated in our initial admonitions that we gave before the evidence started, cease the conversation immediately. If they persist for some reason, you can write a note to the bailiff and the court. I will share that information with the lawyers and we'll take the appropriate action.

12

"The idea, of course, is that all of the evidence in this case must come only from the witness stand and from no other source. It's very important that you not get on the Internet and start Googling things related to the case. It's just the nature of these communication devices, something that is a concern with all judges in the State of California.

"With that, ladies and gentlemen, I'm going to release you until 9:30 Tuesday morning. Remember all of the admonitions, particularly not to form or express any opinion on this case or discuss it with anyone. Thank you much."

B. Analysis

Swaim contends his convictions must be reversed because the trial court's failure to question the entire jury about their ability to remain fair and impartial after viewing J.S.'s emotional display in the hallway and the signs in front of the courthouse violated his right to due process of law and to a jury trial. He asserts that the trial court's refusal to inquire left everyone speculating as to whether juror misconduct occurred.

A criminal defendant "has a constitutional right to have the charges against him or her determined by a fair and impartial jury." (*People v. Duran* (1996) 50 Cal.App.4th 103, 111; U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) Juror misconduct occurs when there is a direct violation of the juror's oaths, duties, or instruction. (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) A juror who consciously receives outside information regarding the case commits misconduct. (*Ibid.*)

A trial court made aware of the possibility of a juror's misconduct court must first decide whether the information before the court warrants any investigation into the matter. (*People v. Fuiava* (2012) 53 Cal.4th 622, 710.) After an inquiry into the misconduct issue, the trial court must then decide whether, under Penal Code section

13

1089, there is "good cause" to excuse the juror at issue. (*Ibid.*) A hearing to determine whether a juror should be replaced "is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343.) "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*Ibid.*)

Here, Swaim failed to establish an abuse of discretion as he presented no evidence that any juror committed misconduct. Although defense counsel expressed concern that jurors had been exposed to J.S. crying outside the courtroom and "everyone is watching this," he presented no evidence showing any juror appeared to be influenced by the incident. When the court learned of the isolated incident it indicated that it had already instructed the jury to not consider anything that occurs outside the courtroom. Additionally, at the end of the day, the court instructed the jurors they were to "get all [their] information from right here in court and from no other source."

Similarly, as to the signs outside the courthouse, defense counsel failed to show any juror actually read the signs and was influenced by them. Notably, when defense counsel raised the issue with the court, he admitted not reading the entire sign. The trial court tackled this issue by repeatedly admonishing the jury to ignore such material and instructing that all evidence must come from the witness stand. These points were again

14

addressed in the jury instructions telling jurors they must decide what happened "based only on the evidence that has been presented to you in this trial," and "not let bias, sympathy, prejudice, or public opinion influence" their decision. (CALCRIM No. 200.) Also, they were told under CALCRIM No. 222, that evidence was "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence" and they "must disregard anything [they] saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses." It is well established that "frequent and specific cautionary admonitions and jury instructions . . . constitute the accepted, presumptively adequate, and plainly less restrictive means of dealing with the threat of jury contamination." (*NBC Subsidiary (KNBC–TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1221.) We must assume the jurors did their duty and abided by these cautionary instructions. (*Id.* at pp. 1223-1224.)

Given the court's repeated admonitions and the absence of evidence of any juror misconduct, it was not unreasonable for the trial court to decline to question the entire jury about their ability to remain fair and impartial.

### III. *Alleged Instructional Error*

A. Background

During trial, the court reviewed the proposed jury instructions with counsel. Defense counsel indicated he wanted CALCRIM No. 318 to be given. After confirming that the prosecution also wanted the instruction, the court stated that the instruction would be given. The trial court later reviewed the jury instructions with counsel, with both sides agreeing to the instruction. CALCRIM No. 318 instructed the jury as follows: "You

15

have heard evidence of statements that a witness made before the trial.  If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] And [¶] 2. As evidence that the information in those earlier statements is true."

B.  Analysis

Swaim contends CALCRIM No. 318 improperly favored the prosecution because it (1) failed to tell jurors they could find A.S.'s statements untrue, and disregard them altogether and (2) improperly told the jury to give more weight to A.S.'s out of court, unsworn statements than to her court testimony given under oath and subject to cross-examination.  He contends the error requires reversal as it violated his right to a jury trial and due process.  Swaim admits defense counsel failed to object to the instruction below, but claims we should review the merits of his arguments because the error affected his substantial rights.  (Pen. Code, § 1259 ["The appellate court may … review any instruction given, … even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)  The Attorney General responds that Swaim forfeited the argument under the invited error doctrine.

"The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction."  (*People v. Lucero* (2000) 23 Cal.4th 692, 723-724.)  However, the mere failure to object to an instruction is insufficient to show invited error.  (*People v. Moon* (2005) 37 Cal.4th 1, 29, fn. 4 [rejecting invited error claim where "defense counsel merely acquiesced to the instruction, and the record does not show

whether counsel's decision was a tactical one"]; *People v. Smith* (1992) 9 Cal.App.4th 196, 207, fn. 20 [rejecting invited error claim where counsel failed to object to instruction because "merely acceding to an erroneous instruction does not constitute invited error"].) Here, review of the record shows that while defense counsel agreed with the court and the prosecution that CALCRIM No. 318 could be given, it is not clear whether this decision was a " 'conscious and deliberate tactical choice,' " thus forfeiting the alleged error. Accordingly, we exercise our discretion to review Swaim's contention on its merits. (Pen. Code, § 1259.)

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) In making this analysis, we presume jurors are intelligent persons who are capable of understanding, correlating, and applying all jury instructions given. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) Where reasonably possible, we interpret the instructions " 'to support the judgment rather than to defeat it.' " (*Id.* at p. 1112.)

Swaim first argues that CALCRIM No. 318 failed to tell jurors they could find A.S.'s prior statements untrue, and disregard them altogether. He claims the remaining instructions did not cure the defect as the specificity in CALCRIM No. 318 "trumped" the other instructions by requiring the jury to consider any prior inconsistent statement only for its truth. We conclude it is not reasonably likely the jury understood the instruction as disallowing a finding that prior statements were untrue. First, the

instruction simply informed the jury that it "may" consider a prior statement as evidence of the truth of that statement's content, should it choose to consider the statement at all. (*People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028 ["By stating that the jury 'may' use out-of-court statements, the instruction does not require the jury to credit the earlier statements even while allowing it to do so."].)  In turn, CALCRIM No. 302 instructed the jury that if there was a conflict in the evidence, they "must decide what evidence, if any, to believe."

We reject Swaim's next contention that CALCRIM No. 318 improperly told the jury to give more weight to A.S.'s out of court, unsworn statements than to her sworn court testimony.  CALCRIM No. 318 tells the jury how it *may* use statements of witnesses made before trial — it does not instruct on the weight to give such evidence. Moreover, the instruction must be read in connection with CALCRIM No. 226, which told the jury it could accept or reject any testimony and CALCRIM No. 220, which instructed as to the People's burden of proof and that the jury must impartially compare and consider all the evidence.  When CALCRIM No. 318 is considered in the context of the jury charge as a whole, there is no reasonable likelihood the jury misapplied the instruction.  (*People v. Tate*, *supra*, 49 Cal.4th at p. 696.)

IV.  *Alleged Prosecutorial Misconduct and Ineffective Assistance of Counsel*

A.  Background

During a break in J.S.'s testimony, the prosecutor indicated that she wanted to present evidence that Alicia and Swaim took their children to an attorney after returning from their trip to Hawaii.  Defense counsel objected to the proposed evidence on hearsay

18

grounds and on the basis the whole story was a lie.  The trial court admitted the evidence to show what effect this may have had on the state of mind of A.S. and J.S.  During closing argument, the prosecutor referred to the fact Swaim took his daughters to an attorney:

> "[PROSECUTOR]:  [J.S.] goes to the mom, and the mom is crying.  According to [Swaim's] testimony, the mom never tells him why she is crying, just that there is some so-called allegation.  He doesn't ask her what they are?  Nobody know[s]?  So he has got no clue what these allegations are, according to what he says on the stand, no clue.  Yet, for some reason, his response is, 'Let's take these two daughters to a criminal defense attorney?'
>
> "Ask yourself, if you are a father and you hear that your child made allegations that are upsetting, how many of you automatically jump to the assumption that it must be a crime?  Nobody would jump to that assumption.  The reason why we took them to Mr. Espinosa is because [J.S.] was correct in saying, he knew exactly what she is accusing him of and he knew what [A.S.] was accusing him of that day too, *not only because he had done it, but because they had told him*.  They have conversations in Hawaii."  (Italics added.)

In his closing remarks, defense counsel referred to the fact Swaim took J.S. and A.S. to his office to talk.  He told the jury that Swaim took the victims to his office simply to talk and the jury should not assume from this conduct that Swaim did anything illegal.  In reply, the prosecutor noted J.S.'s testimony that she had told Alicia about her allegations against Swaim and Alicia then told Swaim.  The prosecutor contrasted this testimony with Swaim's testimony that he had no idea about any of the allegations against him, telling the jury to consider who was more credible.  The prosecutor then stated:

"In Hawaii, [Swaim] again hears about some vague allegations or, rather, for the first time. He doesn't know what they are but he goes to a criminal defense attorney. Again, I submit that is not normal behavior for somebody who has no idea what these allegations are from their kids. *That's what somebody does when they know they are being accused of a crime or they know they committed a crime. In this case it was both.* He knew what he had done and he knew his daughters were finally going to come out with it so he went to his lawyer, took [his] daughters there." (Italics added.)

B. Analysis

Swaim contends the prosecutor improperly argued in closing argument that his consultation with an attorney demonstrated a consciousness of guilt; however, he admits that his trial counsel failed to object to the argument and request an admonition. Under these circumstances, Swaim forfeited this claim. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) Because Swaim also asserts his trial counsel was ineffective for failing to object, we review his claims in this context. We find no misconduct and reject Swaim's ineffective assistance of counsel argument.

To prevail on a claim of ineffective assistance of counsel, defendant must show (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) On direct appeal, we may reverse a conviction for ineffective assistance of counsel only if the record affirmatively discloses no rational tactical purpose for counsel's challenged act or omission. (*People v. Vines* (2011) 51 Cal.4th 830, 876.) Where the record sheds no light on the issue, we must affirm unless

there could be no conceivable reason for counsel's act or omission. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Salcido* (2008) 44 Cal.4th 93, 172; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772-773 [rejecting contention counsel's failure to object during prosecutor's closing argument amounted to ineffective assistance because counsel "may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"].)

We conclude Swaim failed to meet his burden of overcoming the strong presumption that his trial counsel's failure to object to the prosecutor's statements fell within the wide range of reasonable professional assistance. In arguing to the jury a prosecutor has broad discretion to express his or her view of the evidence and the inferences and deductions that may be drawn from it. (*People v. Sims* (1993) 5 Cal.4th 405, 463.) The question is whether there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Ayala* (2000) 23 Cal.4th 225, 284.) The trial court ordinarily grants a prosecutor wide latitude during argument (*People v. Wharton* (1991) 53 Cal.3d 522, 567), and the allegedly improper remark must be viewed in the context of the closing argument as a whole (*People v. Lucas* (1995) 12 Cal.4th 415, 475).

J.S., A.S. and Swaim all stated that upon returning from their trip to Hawaii, Swaim took his family to see an attorney. J.S. and A.S. each met with the attorney alone. During cross-examination, Swaim claimed that other than a brief conversation in Hawaii

about some unknown criminal allegations, he first learned about J.S.'s claims when he read the reports in this case. However, J.S. testified that Alicia learned of her allegations when J.S. was about 10 years old and recalled being in the kitchen with her parents while her mother cried and Swaim accused her of lying. A.S. stated that Alicia and Swaim confronted her about a week after the incident with Alicia asking her if it had been "real" or a "dream." Additionally, both J.S. and A.S. spoke about their parents confronting them in Hawaii where Swaim claimed he had not done anything, asked why they were doing this and explained the possible consequences if they went forward with their allegations.

During closing argument, the prosecutor recounted what had happened in Hawaii, referred to the fact Swaim took his daughters to an attorney and argued Swaim knew exactly what his daughters were accusing him of "not only because he had done it, but because they had told him" in Hawaii. Viewed in context, the prosecutor's closing argument attacked Swaim's veracity about not knowing the nature of the criminal allegations against him until he read the reports in this case.

During rebuttal argument, the prosecutor directly attacked Swaim's credibility and then remarked that Swaim's visit with a criminal defense attorney was "not normal behavior for somebody who has no idea what these allegations are from their kids. That's what somebody does when they know they are being accused of a crime or they know they committed a crime. In this case it was both. He knew what he had done and he knew his daughters were finally going to come out with it so he went to his lawyer, took his daughters there." Again, viewed in context, the prosecutor's comments attacked

22

Swaim's credibility. Accordingly, the prosecutor's remarks cannot be deemed objectionable as the jurors would have understood them as an attack on Swaim's credibility. (*People v. Cox* (2003) 30 Cal.4th 916, 960 ["If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable.' "].)

Swaim's claim that the prosecutor's argument was comparable to the improper argument in *United States ex rel. Macon v. Yeager* (3rd Cir. 1973) 476 F.2d 613 (*Macon*) is misplaced. In *Macon*, the prosecutor asserted in closing argument: "[The defendant] goes home and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold, what does he do. He called his lawyer. These are acts of innocence? [¶] I say, ladies and gentlemen, his story is implausible, impossible and you can judge by his own conduct, unbelievable." (*Id.* at p. 614, emphasis omitted.) The inference from this comment was that only a person who is guilty would contact an attorney; thus, the *Macon* court acknowledged it is improper for a prosecutor to comment negatively on a criminal defendant's constitutional right to counsel. (*Macon*, at p. 615; also, *United States v. McDonald* (5th Cir. 1980) 620 F.2d 559, 564.)

This is not the situation here as Swaim did not go to an attorney alone as an exercise of *his* constitutional right to counsel; rather, he took his daughters to an attorney and the attorney talked to them outside of Swaim's presence. Under these circumstances, trial counsel could have easily concluded, as do we, that the prosecutor's references to seeking advice from counsel were inconsequential, particularly given J.S., A.S. and

Swaim's testimony about the event and defense counsel's argument to the jury they should not assume Swaim did anything illegal merely because he took the victims to see an attorney.

## V. *Alleged Sentencing Error*

In counts 1 and 3, the jury found Swaim guilty of committing lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)). In counts 2 and 4, the jury found him guilty of oral copulation of a person under the age of 14 and more than 10 years younger than him (Pen. Code, § 288a, subd. (c)(1)). Swaim contends his convictions on counts 2 and 4 must be reversed because a violation of Penal Code section 288a as alleged in counts 2 and 4 is necessarily included in the greater Penal Code section 288 offense as alleged in counts 1 and 3.

The Attorney General contends that counts 1 and 3 (the lewd act charges, Pen. Code, § 288, subd. (a)) should be stricken because they are lesser offenses of the charges of forcible oral copulation on a minor (Pen. Code, § 288a, subd. (c)(1)) alleged in counts 2 and 4. In his reply brief, Swaim states that the Attorney General is correct and counts 1 and 3 should be reversed. We reject the Attorney General's argument and Swaim's concession. Swaim's original argument was correct.

Where sex offenses are separate and distinct acts the defendant can be punished separately for each offense. (*People v. Hicks* (1965) 63 Cal.2d 764, 766.) Here, however, a single act on each of the victims formed the basis of counts 1 and 2 as to J.S. and counts 3 and 4 as to A.S. In this situation, the prosecution may charge both crimes in the same information, but the jury must be instructed that, as in the case of necessarily

24

included offenses, there can be only one verdict of guilty. (*People v. Greer* (1947) 30 Cal.2d 589, 604; see CALCRIM No. 3516.)

As stated in *People v. Lathrop* (1986) 181 Cal.App.3d 1217 (*Lathrop*), "where a defendant who has committed a single act of oral copulation against a child under the age of 14 has been convicted of violating both [Penal Code] section 288 and the lesser included offense of [Penal Code] section 288a. [Citation.] The rule is clear that this erroneous dual conviction is remedied by setting aside the conviction and sentence for the less severely punishable offense. [Citations.] [¶] In this case, the less severely punishable offenses were the [Pen. Code, §] 288a convictions. Although both offenses carry base terms of three, six or eight years ([Pen. Code,] §§ 288, subd. (a), 288a, subd. (c)), only the [Pen. Code, §] 288 convictions trigger the mandatory prison sentence provisions of [Penal Code,] section 1203.066." (*Id.* at pp. 1220-1221; *People v. Cline* (1969) 2 Cal.App.3d 989, 997 [violation of [Penal Code] section 288a is included in the violation of [Pen. Code, §] 288; thus, the conviction, as well as the sentence for the [Pen. Code, §] 288a offense, must be reversed].)

Thus, counts 1 and 3, the lewd act charges (Pen. Code, § 288, subd. (a)) are the greater offenses and counts 2 and 4, the oral copulation charges (Pen. Code, § 288a, subd. (c)(1)) were the lesser offenses. Accordingly, Swaim's convictions on counts 2 and 4 are reversed and the matter remanded for resentencing in light of this change. Additionally, as an aside, we note that the trial court improperly sentenced Swaim on both counts relating to J.S. and stayed both counts relating to A.S.

## VI. *Imposition of Upper Term*

### A. Background

In preparing his report, the probation officer was unable to reach J.S. The probation officer spoke with A.S., with A.S. requesting leniency in sentencing. The probation officer interviewed Swaim, who denied all of the allegations and claimed the trial was a "miscarriage of justice." As factors in mitigation, the probation officer noted that Swaim had no prior record of criminal conduct. As factors in aggravation, the probation officer stated: (1) the crimes involved great violence, great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of mental cruelty, viciousness, or callousness (Cal. Rules of Ct., rule 4.421(a)(1), all rule references are to these rules); (2) the victims were particularly vulnerable (rule 4.421(a)(3)); and (3) Swaim took advantage of a position of trust or confidence to commit the offenses (rule 4.421(a)(11)).

Dr. Louis Blumberg, a supervising clinical psychologist with the Imperial County Behavioral Health Services, prepared a report under Penal Code section 288.1 to assess Swaim's suitability for probation. Dr. Blumberg interviewed Swaim at the jail on two separate occasions, reviewed all available police records, and spoke to the deputy district attorney and probation officer assigned to the case. Dr. Blumberg noted Swaim had several risk factors. Family members had characterized him as disregarding and violating the rights of others, deceptive and manipulative, impulsive, and lacking remorse. Swaim had a history of sexual deviation and numerous instances of sexual violence. Additionally, he denied any wrongdoing and refused psychological intervention.

Dr. Blumberg diagnosed Swaim with pedophilia and antisocial personality disorder. She placed him in the moderate to high risk category for reoffending if he were placed on probation.

Defense counsel submitted a sentencing memorandum which included objections to the probation officer's report, a request for a new report, and a request to strike Dr. Blumberg's report. Counsel also objected to two aggravating circumstances: (1) the crimes were especially vicious or callous and (2) the victims were particularly vulnerable. Dr. Clark Smith, a general and forensic psychiatrist, interviewed Swaim and Alicia and reviewed various documents, including Dr. Blumberg's report. Dr. Smith concluded that Swaim did not have either pedophilia or antisocial personality disorder and presented a low risk for reoffending. Thus, Dr. Smith disagreed with Dr. Blumberg's finding that Swaim's risk of reoffending was moderate to high.

At sentencing, the court denied defense counsel's request to strike Dr. Blumberg's report, stating it would take both psychological reports into consideration in reaching a decision. The court denied Swaim's request to strike a majority of the probation officer's report. The court stated the law allowed him to consider charges which resulted in an acquittal; thus, he reviewed the record of the 1995 A.S. trial and concluded, by clear and convincing evidence, that Swaim had molested A.S. The court noted that conflicting medical evidence had been presented and understood why the A.S. jury acquitted Swaim. The court rejected defense counsel's position regarding lack of remorse as a factor, but stated it would not rely upon Swaim's refusal to admit the crimes as a factor in imposing sentence.

After hearing argument from counsel, the court concluded that Swaim was not a suitable candidate for probation. It then evaluated mitigating circumstances, including lack of a criminal conduct and a long history of good conduct at work. The court found the sexual conduct to be significant, and found the victims particularly vulnerable, noting they were very young and had nobody except their parents to rely upon. It found Swaim had threatened witnesses, unlawfully dissuaded them from testifying, suborned perjury and interfered with the judicial process. The court also found the crimes indicated planning and sophistication and that Swaim took advantage of a position of trust and confidence, as both a father and law enforcement officer, to commit the offenses.

B. Analysis

Swaim asserts the trial court relied on improper findings on three aggravating circumstances and failed to accord proper weight to the mitigating circumstances. Specifically, he claims the court abused its discretion by improperly relying on rules 4.421(a)(3), (8) and (11) to find that the victims were "particularly vulnerable," that the crimes indicated "planning, sophistication, or professionalism," and Swaim "took advantage of a position of trust."

The Attorney General asserts Swaim forfeited any error to the use of "planning, sophistication, or professionalism" and abuse of a position of trust as aggravating factors by failing to object on these grounds below. "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.) Here, Swaim failed to object to two of the factors relied on by the trial court; thus,

28

the issues are forfeited on appeal. Even assuming these issues were not forfeited, we conclude no prejudicial error occurred.

A trial court has broad discretion to decide whether to select the upper, middle, or lower term of imprisonment. (Pen. Code, § 1170, subd. (b); rule 4.420(b).) In determining which term of imprisonment to impose, the court is not limited to the factors set forth in rule 4.421; rather, any relevant fact may be considered. (*People v. Covino* (1980) 100 Cal.App.3d 660, 671; rule 4.408(a).) "A single factor in aggravation will support imposition of an upper term. [Citation.] 'When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper.' " (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433-434.)

Swaim contends the trial court erred in finding the victims "particularly vulnerable" under rule 4.421(a)(3) because the young age of the victims has already been taken into account in the sentencing scheme for child molestation. Swaim is correct that "aggravating a sentence due to 'particular vulnerability,' where vulnerability is based *solely* on age, is improper when age is an element of the offense." (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1693-1694.) Vulnerability, however, is not limited to the age of the victim.

A "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's

29

criminal act." (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.) Here, the trial court found that the victims were particularly vulnerable because they were Swaim's biological daughters and subject to his parental control. Thus, the court did not err in relying on the vulnerability in imposing the aggravated term.

Swaim next asserts the trial court erred in finding the offenses involved "planning, sophistication, or professionalism" under rule 4.421(a)(8), arguing that the offenses were opportunistic, one-time events. Rule 4.421(a)(8) is written is the disjunctive. While we agree there was no degree of sophistication or professionalism in these crimes, they did involve planning. Namely, Swaim waited to commit the crimes until Alicia was out of the house and the other daughter was asleep or out of the house. That Swaim did not repeatedly molest his daughters is irrelevant.

Finally, Swaim asserts the trial court erred in finding that Swaim took advantage of a position of trust and confidence, as both a father and law enforcement officer, to commit the offenses. We agree. As we discussed, Swaim's relationship with the victims supported a finding of vulnerability. Here, the trial court used that relationship again to find the existence of another aggravating factor. (Rule 4.421, subd. (a)(11) ["defendant took advantage of a position of trust or confidence to commit the offense"].) "[T]hese factors are two sides of the same coin. The significant circumstance is the relationship between the defendant and the victim[s]. The circumstances that placed the defendant in a position of trust and confidence were identical to the circumstances which placed the victim[s] in a position of vulnerability." (*People v. Garcia* (1985) 166 Cal.App.3d 1056, 1070.) Because the trial court used the relationship between Swaim and the victims in

30

support of the vulnerable victim factor (rule 4.421(a)(3)), the court could not use that fact in support of a separate aggravating factor (rule 4.421(a)(11)).

The trial court also found Swaim used his position as a law enforcement officer to commit the offenses, noting that the victims knew he was a law enforcement officer. (Rule 4.408(a) [authorizing court to consider any other criteria reasonably related to its discretionary sentencing decision].)  The parties have not cited and we have not found any cases addressing the defendant's position as law enforcement officer as an aggravating factor.  While we agree that a defendant's use of his or her position as law enforcement officer to commit a crime can be considered as an aggravating factor, there is no evidence that Swaim did so here.

Nonetheless, we conclude it is not reasonably probable the court would have imposed a lesser sentence minus this improper factor as the trial court identified three proper factors to support the imposition of an upper term sentence.  As we discussed, the trial court properly relied on the vulnerability of the victims and planning.  (Rule 4.421(a)(3) & (8).)  Additionally, when imposing the upper term, the trial court cited rule 4.421(a)(6), noting that Swaim "clearly" tried to prevent the victims from reporting the crimes to law enforcement and this is why "we're here ten years later."  The evidence supported the trial court's reliance on this factor.  After the incident with A.S., Swaim made A.S. promise not to tell anyone.  When J.S. was about 10 years old, J.S. spoke to Alicia and Swaim about what happened, with Swaim accusing her of lying.  While the family was in Hawaii, J.S. and A.S. spoke to Swaim.  Swaim told his daughters there

31

would be consequences if they went forward with their allegations and the family would lose everything.

Swaim does not dispute that any of these three factors would suffice to support the imposition of the upper term. Under these circumstances, we conclude it is not reasonably probable that the trial court would have imposed a lesser term if it had known that one of the factors it relied upon was improper. Accordingly, any error was harmless and resentencing is not required. (*People v. Cruz*, *supra*, 38 Cal.App.4th at pp. 433-434.) In summary, the trial court carefully considered the entirety of the circumstances and its imposition of the upper term was neither irrational nor arbitrary.

## VII. *Restitution Fines*

The sentencing court imposed restitution and parole restitution fines of $280. Swaim contends both fines must be reduced to $200, the minimum in effect at the time he committed his crimes. The Attorney General argues, and Swaim agrees, the issue is moot because the trial court subsequently issued a minute order rescinding its previous imposition of fines and reducing both fines to $200.

DISPOSITION

Counts 2 and 4 are reversed and the matter is remanded for resentencing, including correction of the erroneous stay of count 3. In all other respects, the judgment is affirmed.

McINTYRE, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.